LINDSTEDT-HOFFMAN COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11741. Promulgated October 12, 1948.

*J. P. Nash, Esq.*, for the petitioner.
*R. L. Greene, Esq.*, for the respondent.

588

OPINION.

OPPER, *Judge*: The present difficulty does not arise because of any question that some part of petitioner's income was "abnormal" within the meaning of section 721. It was abnormal in size,[2] and that suffices. *Geyer, Cornell & Newell, Inc.*, 6 T. C. 96. The reason given for at-

[2] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME. The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence

tributing it to other years, which is also necessary, *Harris Hardwood Co.*, 8 T. C. 874, 882, namely, the duration of the bond liability for a period of more than 12 months, is related to a class of income which may itself be abnormal,[3] but we take it that that would merely fortify petitioner's position, not as a ground of abnormality, but as a ground of attribution [4]—which is also necessary, Regulations 109, sec. 30.721–3, as amended by T. D. 5045, 1941–1 C. B. 69, 86, on the theory that "other years" must always be involved when a contract lasts more than one; and that Congress so recognized.

The problems at hand are, to the contrary, practical, not theoretical. It is quite evident that, to some extent at least, this extraordinary income was, in fact, the result of increased demand, improved business, higher prices, or some combination of all three. Not only do the figures [5] make this clear, but these conditions were a direct consequence of the very aspect of the economy which motivated the excess profits tax—the existence of the European war and the domestic armament program. See *Eitel-McCullough, Inc.*, 9 T. C. 1132, 1148.

If all of the abnormal income could be thus characterized, its abnormality would not suffice to justify special relief. Precisely such increases over the base period were the objective and the rationale of the tax.

\* \* \* It is seen from this history and from the provisions of the act that the profits of a taxpayer for the base period years were to be regarded as normal in most cases and the tax was to be applied, generally, to the excess of the profits of the tax year over the prior normal profits. Congress anticipated that business for many taxpayers would improve because of external changes and it intended the tax to apply in those cases. \* \* \* [*Soabar Co.*, 7 T. C. 89, 96.]

On the other hand, even the respondent's regulations do not eliminate all abnormal income, but limit the exclusion for this cause "*to the extent* that any items of abnormal income in the taxable year are the result of high prices, \* \* \* increased demand \* \* \* or decreased competition \* \* \*." (Emphasis added.) Regulations 109, sec. 30.721–3. We take this to authorize relief when to some extent, even if not wholly, the abnormality is due to other causes, see *W. B.*

---

[3] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

   (a) DEFINITIONS.—For the purposes of this section—

    \*     \*     \*     \*     \*

   (2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income :

    \*     \*     \*     \*     \*

   (B) Income constituting an amount payable under a contract the performance of which required more than 12 months ;

    \*     \*     \*     \*     \*

[4] "Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events."

[5] Accepting the five-year duration of the bonds, advanced by petitioner as the source of abnormality, the 1940 bonds written were more than five times the average of the prior years shown, the premiums more than seven times the average, and petitioner's commission approximately ten times the average of the four base period years.

*Knight Machinery Co.*, 6 T. C. 519, 531, at least when the basis for allocation to other years consists, as it does here, of the circumstance that we are dealing with a contract requiring several years for its performance; although to be sure that may be merely another way of saying that improved business does not account for all of the increased income.

We are hence not persuaded that either extreme of the views advanced can be approved here. We need not, on the one hand, agree that the income was due entirely to improved business, *Geyer, Cornell & Newell, Inc., supra*, nor, on the other, that it is attributable entirely to the chronological span of the service. See *Ramsey Accessories Manufacturing Corporation*, 10 T. C. 482. When all is said, there consequently remains to be ascertained what constitutes the source of the income, and, if necessary, to what extent it seems to be the one or the other. And merely because some work remains to be done under a contract, an equal division among all the years of its performance is not necessarily called for. The justification advanced for the present annual allocation, that the earning of the income coincides with the passage of time, certainly does not dispose of the probability that the procurement of the business in the first instance was the most potent factor in the earning of the commissions. Since that occurred in the tax year in issue, it seems necessary to place upon that year the greatest emphasis.

Without information as to the applicable data, the customary "earned premium" or "handling charge," the respective costs, the experience of petitioner and its competitors in the trade, the views of other qualified brokers, the impact of generally improved conditions on petitioner's line of business, and other bases for allocation, we have somewhat arbitrarily, see *Cohan* v. *Commissioner* (C. C. A., 2d Cir.), 39 Fed. (2d) 540, apportioned one-third of the "net abnormal income" to improved business and have divided the remaining two-thirds equally between procurement and servicing. See *Ramsey Accessories Manfacturing Corporation, supra*. In our findings we have accordingly spread only the latter one-third over the five years of the life of the contract and the services rendered thereunder,[6] allocating to each year one-fifteenth of the total.

We have not, however, attempted to compute or to require of petitioner, any figures for the "direct costs" covered by the statute.[7] It

---

[6] As our findings show, some services were apparently rendered in each of the five years, 1940–1944, inclusive.

[7] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

　(a) DEFINITIONS.—For the purposes of this section—

　*　　　*　　　*　　　*　　　*　　　*　　　*

　(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary. (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same

seems to be agreed that no such items appear on petitioner's books, which would be their most likely source, and the finding made at respondent's request so implies.  If, in spite of this, it is claimed that such costs were incurred, the burden of going forward with evidence of their existence, if not of their amount, seems to us to have shifted to respondent.  See *Soabar Co.*, *supra*, 94.  Other figures for the computation of "net" abnormal income having now been agreed to, all of the necessary material is available for the recomputation.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

ARUNDELL, *J.*, dissenting: I agree with the majority opinion in its holding that the commissions received for the taxable year 1940 by petitioner in connection with the writing of the five-year performance bonds constituted net abnormal income, and that petitioner is therefore entitled to special relief on its excess profits tax for 1940, under the provisions of section 721 of the Internal Revenue Code.  I do not agree, however, that the relief granted is adequate.  The majority have attributed one-third of the income to increased demand, improved business, and higher prices; one-third of the income is attributed to the procuring and writing of the bonds; and only one-third of the income is allocated to the succeeding five years which the bonds would run and during which they were to be serviced by petitioner.  In my opinion, there is no evidence in the record whatever to support the majority holding that one-third of the income is attributable to "increased demand, improved business, and higher prices." The evidence makes clear that the large commissions received in 1940 were due to the fact that the bonds were written for a five-year term and not for the usual one-year term.  The rate of commission was no greater for the year 1940 than in past years.

I agree that a greater sum should be attributable to the first year by reason of the fact that the work incident to the securing and writing of the bonds was performed in that year.  But, it seems to me, based on this record, that if one-third of the income is attributed to 1940, this sum is sufficiently liberal to cover the matter of securing the business and writing the bond and also to cover any amount that could be attributed to that year by reason of improved business.  I would, therefore, attribute to the year 1940 not more than one-third of the income and spread the remaining two-thirds, not over the original five-year period of the bond, but over the period that the risk actually extended.

---

ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

MURDOCK, *J.*, dissenting: Section 30.721–3 of Regulations 109 was considered in *Soabar Co.*, 7 T. C. 89, 95, and the conclusion reached that no portion of net abnormal income of a tax year is to be attributed to other years where the excess of the income of this class for the tax year over 125 per cent of the average of this class for the four years was due solely to an improvement in business conditions. Obviously, this improvement means improvement generally, not improvement just in the taxpayer's business. If it were to be measured only by improvement in the taxpayer's business, there never could be any relief under section 721. This very mistake is made in the majority opinion through footnote 5, where reference is made to figures which show, not a general improvement in business conditions, but an increase in the commissions which this particular taxpayer realized in 1940 over those realized by it in the four preceding years.

The increased commissions of this taxpayer in 1940 may have been due to some extent to an improvement in business conditions generally. Any failure of proof there must bear heavily upon the taxpayer. A large part of the 1940 commissions should be attributed to 1940 because that was the year in which the business was obtained and the subsequent servicing of the contracts was not at all comparable in importance to the obtaining of the business. Therefore, I would attribute a large part of the commissions to 1940, including enough to take care of any improvement in business conditions generally. However, I would not assign two-thirds of the net abnormal income to 1940. Two-fifths would be sufficient.

I disagree with the report in attributing any of the net abnormal income to periods beyond those during which the contracts were actually being performed. Hindsight can be used in attributing a part of the net abnormal income for 1940 to other years in which it was actually earned. The report falls into error in allocating it equally over a five-year period when the evidence shows that it was actually earned in a shorter period.